**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 04-CR-0021-CVE |
| ) | |
| **EDD TAWON PAYNE,** ) | |
| ) | |
| **Defendant.** ) | |

**OPINION AND ORDER**

This matter comes before the Court after an extended period of psychological evaluation and testing as to defendant's competence to stand trial. Defendant raised the issue of his possible incompetence prior to his arraignment[1] and has since been subject to psychological evaluation and treatment at the Federal Medical Center in Fort Worth, Texas ("FMC-Fort Worth") and the Federal Medical Center in Butner, North Carolina ("FMC-Butner"). Based on preliminary reports issued by personnel at those facilities, this Court twice found by a preponderance of the evidence that defendant suffered from a mental disease or defect rendering him unable to assist properly in his own defense and ordered him committed for treatment, pursuant to 18 U.S.C. § 4241(d). For the reasons outlined below, the Court now finds defendant is competent to stand trial.

Defendant's extensive period of psychological evaluation produced a total of four reports, each detailing the findings of those doctors charged with observation and examination of defendant. Those reports were filed with this Court April 14, 2004 ("the April 14 report"), January 3, 2005 ("the January 3 report"), June 27, 2005 ("the June 27 report") and August 30, 2005 ("the August 30 report").

---

[1]  On February 5, 2004, the grand jury returned a three-count indictment against defendant for his alleged participation in an armed robbery.

The findings provided in the reports remain relatively unchanged across the duration of defendant's stay at FMC-Fort Worth and FMC-Butner. As to defendant's psychological history, each report takes note of defendant's unfortunate family circumstances and poor performance in school. The reports also outline the course of defendant's progress while at the respective facilities. Defendant, while under observation, demonstrated some basic knowledge of current events, including the name of the current president, and the most rudimentary familiarity with certain basic legal concepts, including the function of a judge. Defendant experienced only one disciplinary problem while detained at FMC-Butner. Despite these positive indicators, defendant, according to reports, demonstrated limited cognitive ability, including poor memory recall, and failed to make progress during his competency restoration courses.

While acknowledging defendant's limited intellectual and cognitive functioning, each report states the evaluators' suspicion that defendant was exaggerating the limits of his cognitive abilities. In this regard, certain examples bear mention. In the April 14 report, Randall Rattan, M.D., of FMC-Fort Worth observes that defendant's performance on the Test of Memory Malingering (TOMM), used to evaluate the possible feigning of cognitive or memory impairment, was "highly suspicious." Defendant's score on the TOMM was comparable to those of individuals suffering from end-stage dementia or serious brain injury who had severe concomitant self-care problems, although defendant possesses none of those characteristics. Similarly, in the January 3 report, Matthew Soulier, M.D., and Julie Amato, M. Ed., point out that on the Validity Indicator Profile (VIP), a test aimed at determining whether current testing is representative of the individual's true overall capabilities, defendant's performance was "Invalid," indicating that defendant's results were likely not an accurate representation of his full capacity to respond correctly.

Notably, the doctors preparing the January 3 report commit a substantial portion of their written evaluation to highlighting their doubts regarding the actual limits of defendant's cognitive functions. The doctors cite at least three observations on which they base their conclusion that "some component of malingering" was likely driving defendant's behavior at FMC-Butner: although defendant frequently appeared tired, withdrawn, and apathetic during interviews with hospital personnel, he participated in basketball games and interacted with other inmates without problem; defendant had initially informed doctors that he was unable to read and write, but a stack of magazines were in his locker, and he later told someone that he liked to write songs on paper at night; and, finally, defendant's recorded IQ score while in school was much higher than the one assessed while in prison custody, an atypical change. The June 17 report, prepared by Peter Quintieri, M.D., and Jill Grant, Psy. D., at FMC-Butner, reiterates the view that defendant's test scores were suspiciously low given his observable degree of impairment. Taken together, these reports suggest that while doctors may have been unwilling to state unequivocally that defendant was attempting to mislead them regarding the severity of his mental impairments,[2] their strong suspicions are voiced in each of the reports.

On August 8, 2005, the Court held a further hearing into this matter, where defendant's co-defendant, Eugene Green, testified. Bruce Berger, M.D., of FMC-Butner, participated by telephone. Green testified, <u>inter alia</u>, to his opinion that defendant was competent at the time of the events in question. Specifically, he stated that defendant had been actively involved in planning the robbery

---

[2] For example, in the April 14 report, Dr. Rattan noted that while he had considered a diagnosis of malingering, he chose not to issue such a diagnosis, since it required evidence of "gross exaggeration" or "fabrication."

3

in question, selling the stolen guns, and counting the money acquired from those sales. The Court stated, for the record, that it found Green's testimony to be credible.

At the Court's request, Dr. Berger prepared a supplemental evaluation, which is the August 30 report. Based on Green's testimony and the Court's statement regarding the reliability of that testimony, Dr. Berger's August 30 report opines that defendant is competent to stand trial. In his report, Dr. Berger explains that Green's testimony at the August 8 hearing confirmed that defendant had been competent during the commission of the crime at issue and that, absent some intervening occurrence, defendant could not have suffered a degeneration in the cognitive functions in question. The report also expresses Dr. Berger's view that the doubts of previous examiners with regard to defendant's mental deficiencies were well-founded. Defendant's poor performance on the cognitive indicators were, Dr. Berger concludes, "more a product of volitional attempts to mislead the evaluators than true abilities."

After reviewing the reports, the Court is in the difficult position of ruling on defendant's competency without an opportunity to question him. The Court recognizes the limits that imposes upon its decisionmaking. Nevertheless, the Court places great faith in the ability of the medical professionals responsible for defendant's evaluation and accords weight to the testimony of Eugene Green who testified, with the greatest reluctance, to his opinion of defendant's competence at the time of the events. In view of the evidence before it, the Court finds that defendant is, in fact, competent to stand trial. The Court does not reject defense counsel's assertion that his client possesses limited intellectual function; it is unwilling to conclude, however, such limitation prevents defendant from understanding and participating in these proceedings.

**IT IS THEREFORE ORDERED** that the Court finds defendant Edd Tawon Payne competent to stand trial.

**DATED** this 8th day of September, 2005.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT